Filed 9/27/22 In re D.P. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078599 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J285456 & J285457) |
| v. | OPINION |
| M.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant, M.M.'s (mother)[1] parental rights to D.P. (born Mar. 2009) and K.V. (born Oct. 2015) (collectively the children). On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On March 7, 2020, personnel from plaintiff and respondent, San Bernardino County Children and Family Services (the department), received allegations that mother's eldest daughter, L.B., who was living at mother and father's residence with the children, threatened to break the reporting party's window, tried to force entry into the reporting party's home, and indicated that she had a gun and was going to shoot the reporting party.[3] It was reported that D.P. was at the home during the incident, where he

---

[1] Mother is the biological mother of K.V. and the biological, maternal grandmother of D.P. D.P.'s biological mother had been deported years earlier and his biological father had disappeared. D.P.'s biological mother "gave her consent for [D.P.] to remain with . . . mother until he is a legal adult . . . ." The juvenile court denied reunification services to D.P.'s biological parents and granted mother presumed mother status as to D.P. D.P.'s biological parents are not parties to the appeal. J.V. (father), the biological father of K.V., is not a party to the appeal.

[2] On June 3, 2022, we incorporated the record from mother's petition for extraordinary writ (see *M.M. v. Superior Court* (Sept. 21, 2021, E077501)) into the record in the current matter.

[3] L.B., who was 17 years of age at the time of the report, was arrested after the incident. The department apparently filed a section 300 petition as to her as well, but that petition is not part of the record. L.B. went missing sometime after her release from custody. Since L.B. was already a ward of the delinquency court, the department later moved to dismiss the section 300 petition as to her. Instead, the juvenile court referred her case to a section 241 committee. L.B. attained the age of majority during the pendency of the case and is not a party to the appeal.

was residing with mother without a verified guardianship. Responding officers tried to contact mother, but she was not home

Father, who was living in the home, had been the subject of a substantiated sexual abuse allegation as to L.B. in 2018.[4] Once contacted, mother reported that D.P.'s mother was living in Mexico, to which she had been deported; D.P.'s biological father had disappeared. Mother reported father had moved back into the home two weeks earlier, that she had gone over the rules with him regarding how to treat the children, and that she had no concerns despite the substantiated allegations of sexual abuse against father.

On June 4, 2020, the department took the children into protective custody and placed them with the foster parents. On June 8, 2020, the department filed Welfare and Institutions Code[5] section 300 petitions as to both children. On June 9, 2020, the court detained the children. The allegations in the petitions, as amended and as pertinent here, alleged domestic violence by parents in front of the children and issues with respect to father's presence in the home after substantiated allegations of sexual abuse against him.

---

[4] The allegations regarding the sexual abuse were substantiated, but the matter was closed after mother took what the department deemed appropriate protective measures, which included seeking a restraining order against father. However, it was later revealed the court dismissed the application for a restraining order "due to lack of prosecution."

[5] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

In the jurisdiction and disposition report filed on June 29, 2020, as to D.P.,[6] the department recommended the court remove him, deny his parents reunification services, and grant mother presumed mother status. Mother "has raised [D.P.], considers him her son, and wants presumed status as a parent." D.P. said that mother was his "'mom, mom'"; she was the only mother he knew. He said he would like to go back with mother.

Due to Covid-19 restrictions, visitation was limited to telephone and virtual visits, which were supervised by the foster mother. On June 19, 2020, the foster mother reported that during a visit on June 16, mother told D.P. to cry during court so that he would be returned home; mother told D.P. if he did so, she would let him do whatever he wanted, including playing video games all the time. When confronted by the social worker, mother denied the allegation.

In the July 7, 2020, jurisdiction and disposition report as to K.V., the social worker reported that the prior investigation as to father involved him touching L.B.'s thighs and taking naked pictures of her. The foster parents reported that K.V. "has not really asked for her parents." K.V. "has had phone calls with parents but she does not seem interested in phone contact with parents. The child walks away." The foster mother reported that mother told K.V. that if asked, she should say she wants to come home. Mother denied the incident; she said K.V. had a history of lying.

---

[6] On June 29, 2020, the department filed an amended petition as to D.P., on which the court detained him on June 30, 2020. The children's cases initially ran separately but were later run contemporaneously.

Parents denied any prior sexual impropriety with L.B. Parents reported that father had moved out of the home. At a hearing on July 8, 2020, the court ordered parents not to discuss the case with K.V. In an additional information to the court report filed August 12, 2020, the social worker reported K.V. had "visits with both parents by video. The visits have been going well, with no reported concerns about the parents' interactions with the child."

At the August 12, 2020, jurisdiction and disposition hearing for both children, the court granted mother presumed mother status of D.P. The court found the allegations in the petitions true, removed the children from parents' custody, and ordered reunification services. The court ordered mother not to discuss the case with the children.

In the February 2, 2021, status review report, the social worker reported that "mother has had facetime calls with the children twice a week for one hour each. The facetimes have been scheduled for Monday and Wednesdays." Mother had been consistent in her "visitations whether they are in person or video call. Recently, the visits have been moved to video call yet again."

Mother reported she was no longer in a relationship with father. The social worker recommended parents "demonstrate, through time, that they are capable of safely caring for the children." The social worker wanted "to slowly increase the visitations." She was hopeful that the children would be able to reunify with parents "within the next few months."

At the hearing on February 11, 2021, the court continued mother's reunification services. The court gave the department authority to give mother overnight and weekend visitation with the children.

In the July 9, 2021, status review report, the social worker recommended the court continue mother's reunification services. K.V. had "quickly bonded to the caregiver." The social worker observed the children in their foster home and indicated that "both children appear comfortable." The foster mother "is having all of the children's needs met. [She] is happy to have the children in her home and is willing to continue to care for the children."

Mother began having unsupervised visits with the children at the beginning of March 2021. Mother informed the social worker that she lived alone and never left the children with anyone else. However, on April 6, 2021, D.P. reported that mother had left him at home with L.B. and her boyfriend. The social worker spoke with K.V. who shared that L.B., who was pregnant, and her boyfriend now lived with mother. After two months, mother eventually admitted that L.B. and her boyfriend were living in the home. The social worker was concerned both because mother had been lying to her and that since L.B. and her boyfriend were both adults, "they would need to complete live scans for the department if they would be around the children and be in the home." Since mother did not make L.B. and her boyfriend available, the social worker limited mother's unsupervised visits to four hours.

On June 14, 2021, the foster mother reported that mother stated that the social worker had promised overnight visitation was to begin that weekend. The social worker

responded that visits were limited to four hours. When the social worker asked mother about it, mother reported that it was a misunderstanding.

The social worker concluded that mother lacked any benefit from the programs in which she was engaged. Mother had "lied on multiple occasions in regards to who the children are exposed to, as well as trying to manipulate the time approved for her visits. The undersigned does not believe that if the children were returned that the mother would be honest with the undersigned regarding who is in the home and who provides supervision of the children while she is at work. In addition, the undersigned has been notified of how the mother will coach the children. The undersigned would like the mother to be honest with the department and realize how coaching and manipulating effects the children and their safety."

In a July 21, 2021, additional information to the court report, the social worker reported that K.V. confided that during a visit the previous weekend, father had shown up and argued with mother. Father denied the incident. At a hearing on July 21, 2021, minors' counsel requested the court consider terminating mother's services and, pending the contested hearing, require that mother's visitation be supervised.

In an additional information to the court report filed July 29, 2021, the social worker asked parents about the incident reported by K.V. Parents denied the incident; mother said she had not had any contact with father since the case began.

The social worker asked D.P. how he felt in his foster placement; he responded that "he is happier because his foster mother is always home with him to keep him safe and reports he is comfortable." The social worker opined that she did "not believe that

7

the children could be safely returned given the multiple issues regarding coaching and minimizing of issues. In addition, it is concerning at this point moving forward, if the children were to reunify, that they would be coached to not come forward with the Department if there were a safety risk in the home."

At the hearing on July 30, 2021, the department argued "the parents are actively coaching the children, they are lying to the Department. Mother's conjoint therapy has been terrible, and it's been terrible for the children because she is actively trying to manipulate and coach them through those sessions." "Mother has lied about who is living in her home, she has been lying about her contact with father, and she has not benefited, so, at this point, we are asking the Court reduce both parents' visits, we're asking that both the parents' visits be supervised as they clearly have not benefited. Mother was leaving the Minors with unauthorized persons during her unsupervised visits and then lying about it."

The court found, "Mother has failed to demonstrate benefit, that she minimizes the domestic violence, that she has not been truthful on occasion with respect to the domestic violence, with respect to who is in her home and who is allowed to supervise these children when she had unsupervised visits." "The Court does believe the visits should be supervised. The Mother was leaving the children, when she had unsupervised visits, with people who were not approved." The court terminated parents' reunification services and set the section 366.26 hearing.

On August 4, 2021, mother filed a notice of intent to file a petition for extraordinary writ. On September 21, 2021, we dismissed the case after counsel failed to

8

timely file the petition. (See fn. 2, *ante*.) On November 12, 2021, mother's counsel filed a motion for reconsideration of the order terminating reunification services.

In the section 366.26 report filed November 16, 2021, the social worker recommended the court terminate parents' parental rights. The social worker reported, "The mother has visited on August 1, September 4, and is scheduled to visit on October 23, and November 7. . . . Both of the parents have their visits with the children at the park in Rialto. The parents have arrived on time and have been consistent. However, it has been reported that there have been issues with the mother during her visits. She has made comments to [D.P.] promising him a new phone if he tells the Department that he wants to return to his mother. [The foster mother] addressed the situation with the mother and she stopped. Again, during a recent visit, the mother asked [the children] where their new schools were and what time they get out. Per the foster mother, she struggles with [D.P.] after every visit with his behaviors."

The social worker further reported that the children had been living with the foster parents since June 4, 2020. The children are appropriate "to be adopted due to their ages . . . and . . . their caregivers' willingness to pursue legalizing the parental relationship to the child through adoption." D.P. stated, "'I want to be adopted by my foster parents.' [D.P.] reports to love his grandmother but understands that [his foster] family will be his forever family. [K.V.] has reported her desire to remain with the foster parents who she identifies as her mother and father." The social worker observed that the foster parents were dedicated to the children "and committed to raising them to adulthood." The social

worker recommended the children "be freed from their birth parents in order to be placed for adoption with" the foster parents.

At the hearing on November 29, 2021, the court denied mother's motion for reconsideration of the order terminating reunification services as untimely. The court instructed mother not to discuss the case with the children: "[I]f you continue to discuss placement with the children or try to obtain information as to where their school is located, and when they—what time they get out of school, the Court will be left with information that shows that you have not benefited from the services that have been provided and would further strengthen the prior order that was made to terminate family reunification services."

On December 22, 2021, mother's counsel filed a section 388 petition. Counsel attached to the petition a letter from a licensed clinical social worker who interviewed mother; the social worker concluded that "[s]evering the parent/child relationship would deprive the children of a substantial, positive emotional attachment and [they] would be greatly harmed by termination of parental rights." On December 23, 2021, the court denied the petition for failure to state new evidence or a change of circumstances and because the proposed change did not promote the best interests of the children.

At the section 366.26 hearing on January 13, 2022, mother introduced the section 388 petition into evidence. The department argued, "It's clear from the reports that the visits are not frequent. They do lack frequency; that the visits with Mother, she's coaching the children, putting pressure on the children, asking them to say specific things to the Department to try to sway them, 'If you tell the Department you want to live with

10

me, I'll get you "X."' [¶] . . . [¶] . . . [A]t this point, we do believe that no exception to adoption applies. The visitation is infrequent. The quality of the relationship is not such of a parent despite Mother's claims and her attachments to the [section] 388 that it is. [¶] And the children have indicated that they wish to be adopted. They are in the only placement they've been placed in since removal, and adoption is the appropriate permanent plan, as well as the legislative preference. So we are asking the Court follow the recommendation."

The court noted, expressly referencing *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), that "the question before the Court is not whether the parent may resume custody of the child, instead the goal at the [section 366].26 hearing is specifically to select and implement a permanent plan for the child. [¶] The Court must determine by clear and convincing evidence whether the child or children are likely to be adopted. If so, and if the Court finds that there has been a previous determination that reunification services be terminated, then the Court shall terminate parental rights to allow for adoption. A statutory exception permits the Court, in exceptional circumstances, to choose an option other than the normal option, which remains adoption."

The court further noted, "There is an exception, and it's the parental benefit exception as explained by the California Supreme Court: In order to establish this exception, a parent must prove regular visitation and contact and a relationship, a continuation of which would benefit the child such that the termination of parental rights would be detrimental to the child."

11

As applied to the instant case, the court found, "There has been what the Court would concede as regular visitation and contact. However, there's no evidence before the Court that termination of parental rights would be detrimental to the children. [¶] . . . [¶] [I]t has been reported that there have been issues with the mother during her visits. She has made comments to [D.P.] promising him a new iPhone if he tells the Department he wants to return to his mother. The caregiver addressed the situation with the mother and she stopped. [¶] During her recent visit though, the mother asked [the children] where their new schools were located and what time they got out of school. [¶] The foster mother reports that she has struggles with [D.P.] after every visit with his mother and she struggles with [D.P.'s] behavior."

"The social worker spoke to both [children] on separate occasions. [D.P.] stated that he wants to be adopted by his foster parents. He loves his grandmother and understands that [his foster] family will be his forever family. [¶] [K.V.] has also stated she desires to remain with the foster parents, whom she identifies as her mother and father. [¶] The report indicates that the foster parents . . . are dedicated to the children and committed to raising them to adulthood."

Addressing the social worker's opinion attached to mother's section 388 petition, the court noted, "there was no bonding study included in Mother's . . . petition. The therapist or licensed clinical social worker did not interview [the children]. And the report is clearly from the mother's point of view that the Court should not proceed with adoption."

12

The court concluded, "There has been no evidence presented at this hearing that continuation of the mother and the father's relationship with the children would benefit the [children]. And there's been no evidence presented that termination of parental rights would be detrimental to [the children]. [¶] The Court is finding that the mother and Father have failed to meet their burden of proof regarding the parental bond exception, and that there's clear and convincing evidence that the children are both generally and specifically adoptable." The court terminated parents' parental rights and ruled that adoption would be the permanent plan.

## II. DISCUSSION

Mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights. She maintains "the juvenile court failed to consider all of the appropriate factors under *Caden C.* and instead focused on the reasons the reunification was terminated rather than the emotional detriment to the children." We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that

termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

"A parent's continued struggles with the issues leading to dependency are not a *categorical* bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637, italics added.) "[M]aking a parent's continued struggles with the issues leading to dependency, *standing alone*, a bar to the exception would effectively write the exception out of the statute." (*Ibid.*, italics added.) "[W]e reject the paradoxical proposition, without any basis in the statute or its history, that the exception can only apply when the parent *has*

14

made sufficient progress in addressing the problems that led to dependency. Parents need not show that they are 'actively involved in maintaining their sobriety or complying *substantially* with their case plan' [citation] to establish the exception." (*Ibid.*, first italics in original; second italics added.) "Issues such as those that led to dependency often prove relevant to the application of the exception. . . . A parent's struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child." (*Ibid.*) "[T]he parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.) "Accordingly, whether the parent is or is not 'ready for the children's return to her custody' is not, *by itself*, relevant to the application of the parental-benefit exception." (*Ibid.*)

Here, the court found that mother had met the first prong of the beneficial parental relationship exception: "There has been what the Court would concede as regular visitation and contact." Thus, we address only the second and third prongs, beneficial relationship and detriment.

### A.  *Beneficial Relationship*

On the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Courts "assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be

15

shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child . . . ." (*Ibid.*)

We review whether there is a beneficial relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "[I]n assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Id.* at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court "'cannot be credited on

16

appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.""" (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Substantial evidence supported the court's finding that mother and the children did not have a beneficial relationship. Early on, the foster parents reported that K.V. "has not really asked for her parents." K.V. "has had phone calls with parents but she does not seem interested in phone contact with parents. The child walks away." D.P. reported that mother had left him at the home with L.B. and her boyfriend, persons who had not been screened by the department. D.P. expressed happiness with the foster mother who, as opposed with mother, was "always home with him to keep him safe" and with whom he was comfortable.

Despite directions from the department and the juvenile court not to discuss the case with the children, mother repeatedly attempted to manipulate the children to behave in ways and reveal information, which would benefit herself. Contrary to mother's complaint, focusing on mother's manipulation of the children was not improper because it reflected on the negative interactions between mother and the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 632 [When determining whether the parent and the child have a beneficial relationship, one of the focal areas is the """positive" or "negative" effect of interaction between parent and child . . . ."'].) Moreover, the foster mother would struggle with D.P.'s "behaviors" after visits with mother.

Furthermore, mother placed the children in the position of being present while she and father argued with one another despite sustained allegations of domestic violence. Mother failed her burden of proving that the children had a substantial, positive,

17

emotional attachment to mother such that they would benefit from continuing the relationship.

Mother cites factors that she contends would support a determination that mother and the children had a beneficial relationship. Those factors include the age of the children, the portion of time the children spent in mother's custody, and D.P.'s positive statements about mother. Mother also complains that the juvenile court failed to order a bonding study and about the lack of focus on the quality of the visits in the reports. Mother contends the court failed to consider all the appropriate factors under *Caden C*.

First, many of the positive statements made by D.P. about mother came immediately after his detention. Although D.P. later asserted that he loved mother, that statement came into context when he expressed his wish to be adopted by his foster parents and his understanding *they* would be his "forever family." Second, under the substantial evidence standard of review, we do not search for evidence that is *contrary* to the conclusion reached by the juvenile court; rather, we determine whether the juvenile court's ruling is *supported* by substantial evidence. Here, as discussed above, substantial evidence supports the court's determination.

Third, mother never requested a bonding study, so she forfeited any argument that the court erred in failing to order one. (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4 ["Trial courts should seriously consider, *where requested* . . . , allowing for a bonding study . . . ."], italics added.) Fourth, any objections about the content of the reports should have been made below. (*In re Mary C*. (2020) 48 Cal.App.5th 793, 801 [By failing to object in the juvenile court to specific defects in the reports, parents forfeit any

challenge to them on appeal.].)  Mother never requested more detailed reports, never requested the case logs, did not oppose the admission of the reports into evidence, did not request the social worker testify at the section 366.26 hearing, and did not testify herself at the hearing about the quality of visitation.  Finally, the court explicitly referenced *Caden C.*, enumerated its required factors, and applied those to the facts of its case.  We discern no misapplication of the law here.  To the extent the court did not provide a list of reasons to support its findings, it was not required to do so.  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 ["[W]e are aware of no requirement—and [mother] cites no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception."].)

### B.    Detriment

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests."  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Id.* at p. 633.)  "[T]he question is just

19

whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.) A parent's issues, which lead to the dependency, may also be relevant to determining detriment, particularly where those issues lead to a narrow bond between the parent and the child. (*Id.* at p. 638 [Court erred in basing its decision on mother's failure to maintain sobriety or seek treatment for her addiction or mental health issues without concluding that those failures affected her relationship with the child.].)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."""" (*Id.* at p. 641.)

The court acted within its discretion in finding that termination of mother's parental rights would not be detrimental to the children. Here, as discussed *ante*, mother failed to establish a beneficial relationship between her and the children. On the other hand, the children were enjoying stability with the foster parents. K.V. had "quickly bonded to the caregiver." The social worker observed the children in their foster home; "both children appear comfortable." The foster mother "is having all of the children's needs met. [She] is happy to have the children in her home and is willing to continue to care for the children."

20

The children had been living with their foster parents since June 4, 2020, almost 19 months prior to the section 366.26 hearing. The social worker reported that the children are appropriate "to be adopted due to their ages . . . and . . . their caregivers' willingness to pursue legalizing the parental relationship to the child[ren] through adoption." D.P. stated, "'I want to be adopted by my foster parents.'" He understood "that the [foster] family [would] be his forever family." K.V. reported her desire to remain with the foster parents, whom she identified "as her mother and father."

The social worker observed the foster parents were dedicated to the children "and committed to raising them to adulthood." The social worker recommended the children "be freed from their birth parents in order to be placed for adoption with" their foster parents. Mother failed to show that the loss of the children's relationship with her would harm them to an extent not outweighed, on balance, by the security of a new, adoptive home with their foster parents. Thus, the court acted within its discretion in determining that the termination of mother's parental rights would not be detrimental to the children.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

21